SEALED

FILED

2017 APR 17 P 2:25

WILLIAM W. BLEVINS
CLERK

| | |
|---|---|
| UNITED STATES DISTRICT COURT | |
| EASTERN DISTRICT OF LOUISIANA | |
| UNITED STATES OF AMERICA, *ex rel.* [PARTY X]<br><br>VERSUS<br><br>[PARTY Y] | 17-3509<br>SECT. G  MAG. 2<br><br>SEALED COMPLAINT<br>UNDER 31 U.S.C. 3730(b)(2) |

# FILED IN CAMERA AND UNDER SEAL

Fee 400 paid
___ Process___
X Dktd___
___ CtRmDep___
___ Doc. No___

- 1 -

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **CHERI TALAMO, Plaintiff**<br><br>VERSUS<br><br>**FRESENIUS MEDICAL CARE MANAGEMENT, AG, FRESENIUS MEDICAL CARE AG & Co. KGaA, FRESENIUS SE & CO. KGaA, FRESENIUS MEDICAL CARE HOLDINGS, INC., SPECTRA LABORATORIES, INC., BIO-MEDICAL APPLICATIONS OF MARYLAND, INC., BIO-MEDICAL APPLICATIONS OF LOUISIANA, LLC, FRESENIUS MEDICAL CARE LOUISIANA DIALYSIS GROUP, LLC, RENAL CARE GROUP, INC., AND BIO-MEDICAL APPLICATIONS OF LOUISIANA, INC., Defendants** | DOCKET NUMBER: _____<br><br>SECTION: _____<br><br>MAGISTRATE: _____<br><br>**COMPLAINT AND JURY DEMAND**<br><br>To be Filed Under Seal<br><br>Do Not Serve |

## INTRODUCTION

This is *qui tam* relator Cheri Talamo's ("Relator") action, through the undersigned counsel, on behalf of herself and the United States of America ("United States") to recover damages and penalties arising from defendants, Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, Fresenius Medical Care Holdings, Inc., Spectra Laboratories, Inc., Bio-Medical Applications of Maryland, Inc., Bio-Medical Applications of Louisiana, LLC, Fresenius Medical Care Louisiana Dialysis Group, LLC, Renal Care Group, Inc.,

and Bio-Medical Applications of Louisiana, Inc. (collectively the "Defendants") using, making, presenting or causing to present false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* The Defendants wrongfully obtained and retained substantial funds from government healthcare programs, including Medicare and TRICARE/CHAMPUS, through false claims and false statements made about the quality of Defendants medical services since at least 2014.

Under the terms of the False Claims Act, the clerk is to file this complaint in camera and under seal. The complaint is to remain under seal for a period of at least sixty days and shall not be served on the defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the complaint and the material evidence submitted to it.

For her cause of action, the Relator alleges as follows:

## NATURE OF ACTION

1. This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2. Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery. 31 U.S.C.§ 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## JURISDICTION

3. This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4. The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants transacts and has transacted business in this District.

## VENUE

5. Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the Defendants resides and/or transacts business in this District.

## PARTIES

6. The Relator brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA"), TRICARE/CHAMPUS, and all other government healthcare programs.

7. The Relator also brings this action on behalf of herself, as permitted under the False Claims Act. Relator Cheri Talamo is a citizen of the United States and a resident of the State of Louisiana. Ms. Talamo based the allegation of this complaint on information in her direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B). Ms. Talamo is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B). Ms. Talamo has knowledge of the false claims and records that Defendants knowingly, falsely and fraudulently submitted to the federal government as she alleges herein.

8. Defendant, Fresenius Medical Care Management, AG, is a corporation organized under the laws of the Federal Republic of Germany with its principal place of business in Homburg, Germany

9. Defendant, Fresenius Medical Care, AG & Co. KGaA, is a limited partnership organized under the laws of the Federal Republic of Germany with its principal place of business in Homburg, Germany.

10. Defendant, Fresenius SE & Co. KGaA, is a limited partnership organized under the laws of the Federal Republic of Germany with its principal place of business in Homburg, Germany.

11. Defendant, Fresenius Medical Care Holdings, Inc., is a non-Louisiana corporation, with, on information and belief, its principal place of business in the State of Massachusetts.

12. Fresenius Medical Care Management, AG, is the general partner of Fresenius Medical Care AG & Co. KGaA and Fresenius SE & Co. KGaA.

13. Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, and/or Fresenius SE & Co. KGaA wholly own and control Fresenius Medical Care Holdings, Inc.

14. Collectively, Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, and Fresenius Medical Care Holdings, Inc. provide products and services for people with chronic kidney failure worldwide through a business they brand "Fresenius Medical Care." Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, and Fresenius Medical Care Holdings, Inc. specifically engage in this business in the United States

directly and through various entities that they wholly own and control. In the United States, they also brand their business as "Fresenius Medical Care North America."

15. Defendant, Spectra Laboratories, Inc., is a non-Louisiana corporation with, on information and belief, its principal place of business in the State of Massachusetts. On information and belief, Spectra Laboratories, Inc. is a wholly-owned subsidiary of either Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, or Fresenius Medical Care Holdings, Inc., or another entity they collectively own or control.

16. Defendant, Bio-Medical Applications of Maryland, Inc., is a non-Louisiana corporation. On information and belief, it domiciles in the State of Delaware and has its principal place of business in the State of Massachusetts. On information and belief, Bio-Medical Applications of Maryland, Inc. is a wholly owned subsidiary of either Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, Fresenius Medical Care Holdings, Inc., or another entity they collectively own or control.

17. Defendant, Bio-Medical Applications of Louisiana, LLC, is a non-Louisiana limited liability company. On information and belief, it domiciles in the State of Delaware and has its principal place of business in the State of Massachusetts. On information and belief, Bio-Medical Applications of Maryland, Inc. is Bio-Medical Applications of Louisiana, LLC's member.

18. Defendant, Fresenius Medical Care Louisiana Dialysis Group, LLC, is a non-Louisiana limited liability company. On information and belief, it domiciles in the State of Delaware

and has its principal place of business in the State of Massachusetts. On information and belief, Bio-Medical Applications of Louisiana, LLC is Fresenius Medical Care Louisiana Dialysis Group, LLC's member.

19. Defendant, Renal Care Group, Inc., is a non-Louisiana corporation. On information and belief, it domiciles in the State of Delaware and has its principal place of business in the State of Tennessee. On information and belief, Bio-Medical Applications of Maryland, Inc. is a wholly owned subsidiary of either Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, or Fresenius Medical Care Holdings, Inc., or another entity they collectively own or control.

20. Defendant, Bio-Medical Applications of Louisiana, Inc., is a non-Louisiana corporation. On information and belief, it domiciles in the State of Delaware and has its principal place of business in the State of Massachusetts. On information and belief, Bio-Medical Applications of Maryland, Inc. is a wholly owned subsidiary of either Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, or Fresenius Medical Care Holdings, Inc., or another entity they collectively own or control.

21. During all material times, Fresenius Medical Care Management, AG, Fresenius Medical Care AG & Co. KGaA, Fresenius SE & Co. KGaA, and Fresenius Medical Care Holdings, Inc., directly and through various entities that they wholly own and control, operate in-center and outpatient dialysis facilities throughout the United States.

22. During all material times, the Defendants collectively operated "Fresenius Medical Care City Home Program," an outpatient dialysis center at 330 North Arnoult, Suite B, Metairie, Louisiana (the "Facility").

23. During all material times, the Defendants collectively employed all people who provided medical services to patients at or through the Facility.

24. During all material times, the Defendants collectively billed Medicare and other government healthcare programs for services the Defendant's employees rendered at and through this Facility.

25. During all material times, Defendants collectively participated in Medicare and other government healthcare programs and have received substantial revenues from these government healthcare programs.

## THE MEDICARE PROGRAM[1] AND RENAL DIALYSIS SERVICES

26. Congress enacted Title XVIII of the Social Security Act to pay the costs of certain health care services for eligible individuals. 42 U.S.C. §§ 1395, *et seq*.

27. HHS is an agency of the United States whose activities, operations, and contracts are paid from federal funds. CMS is a division of HHS that is responsible for the administration and supervision of the Medicare program.

---

[1] The other government healthcare programs, such as TRICARE/CHAMPUS, have similar requirements and the Defendants have similarly defrauded TRICARE/CHAMPUS. Whenever this Complaint uses the term Medicare, the allegations also includes that the Defendants similarly defrauded other government healthcare programs.

28. Human kidneys extract waste from blood, balance body fluids, form urine, and aid in other crucial functions of the body that are essential to life. End stage renal disease ("ESRD") describes the condition when a person's kidneys have failed to the extent that they need renal dialysis or a kidney transplant to stay alive. Renal dialysis is an artificial process that replaces the kidneys' function. There are two types: hemodialysis and peritoneal dialysis.

29. Medical science considers renal dialysis to be "adequate" if it achieves nearly the same level of function as natural kidney. The measurement of dialysis adequacy is represented as a value of "Kt/V." Low levels of the Kt/V measurement are dangerous to the patients' health and can lead to doctors removing the patients from kidney donor lists and even cause the patients to die.

30. Congress, through 42 U.S.C. § 1395rr, END STAGE RENAL DISEASE PROGRAM, provides for Medicare coverage for renal dialysis services. This law sets forth the mechanism for payments to providers of such services to Medicare patients. Subsection (h) creates financial incentives for such providers to provide quality services. This law required the Secretary of the DHH to establish measures to gauge the quality of renal dialysis services the providers render to their patients and then to determine a total performance score weighing these measures for each facility providing such services. The providers must meet or exceed the total performance score or HHS and CMS would reduce their Medicare payments up to 2.0%.

31. In addition to other standards, the Secretary set a 1.70 Kt/V measure as the proper level of adequacy for dialysis performance. The Secretary established a total performance score

based on a calculation comprised from renal dialysis provider's patients' adequacy measurements.

32. CMS required that renal dialysis service providers to report the Kt/V values using specified formulas on all claims for payments on or after January 1, 2012. CMS published these rules so they were available to all Medicare providers.

33. To administering Medicare reimbursement claims, HHS contracts with private insurance companies, known as "carriers" and "fiscal intermediaries," to receive, review, and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. See 42 U.S.C. § 1395u.

34. Medicare providers such as Defendants have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those CMS publishes. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 64-65 (1984).

35. To submit claims electronically, Medicare providers execute an Electronic Data Interchange Enrollment Form which contains several provisions including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

36. It is unlawful for any renal dialysis service provider to make false statements to CMS, HHS, or private insurance companies about the quality of the services it renders, particularly about the level of adequacy of the dialysis services it rendered.

### FRESENIUS MEDICAL CARE

37. The Defendants provide renal dialysis services as defined in 42 U.S.C. 1399(b)(14)(B) to patients with ESRD at the Facility. Included among these services is self-care home peritoneal dialysis support. The Defendants employ and train nurses to render these services.

38. The Defendants provide the home peritoneal dialysis equipment to the patients and the defendants' nurses train the patients on its proper use. Through a "port" surgically implanted in the patient's body, the machines insert a solution that enters the patient's peritoneal cavity to accommodate the dialysis process. Waste products produced from the dialysis process come out of the body in a fluid called "peritoneal dialysate." Special bags, known as "ultrafiltration bags," collect the peritoneal dialysate. The machines have thumb drives, called "IQ drives" that give electronic instructions to the machines to adjust the volume of solution it allows into the body and collect measurements of the volume of peritoneal dialysate the process expels. The patients run their machines at night while they sleep.

39. Defendants' nurses periodically evaluate the patients at the Facility. Every month, the nurse draw the patient's blood. Also, every three months, the patients come to the Facility with a container of all their urine for the preceding 24-hour period and the four bags containing the peritoneal dialysate from the night before. The nurses take several measurements, including the patient's weight, patient's height, urine volume, and infiltration bag weight. The nurses take these measurements by physically observing the scales and rulers, write down the results, and then later enter these results into the Defendants' computer systems.

Additionally, the nurses enter the electronic data from the IQ drives into the computer system. The Defendants send the data from the blood, physical measurements, and IQ drives to defendant, Spectra Laboratories, Inc. Spectra Laboratories, Inc. then performs calculations on this data, including calculations to determine the Kt/V adequacy measurement. The Defendants submit this information, plus additional information the nurses enter in Defendants' computer systems, to CMS, HHS, and private insurance companies as part of their payment applications.

40. CMS and HHS use the Kt/V adequacy measurements, as well as other data Fresenius presented, to determine the Defendants' Facility's total performance score and therefor whether CMS or HHS should deduct up to 2.0% from payments due to the Defendants.

41. Additionally, the patients' doctors rely upon the Kt/V adequacy measurements and other data Defendants' nurse enter in their computer system to make decisions about the patients' health. For example, if a patient's dialysis is not adequate, the patients' doctor can adjust the volume of solution or remove the patient from home dialysis to in-center dialysis.

## WRONGFUL CONDUCT

42. From at least September of 2016, but likely going back to 2014, the Defendants knowingly engaged in systemic false and fraudulent schemes to defraud patients and government healthcare programs out of significant amounts of money.

43. Sometime in 2014, the Defendants hired Melissa Lapworth to be a nurse at the defendants' facility to render renal dialysis service, including peritoneal home dialysis to defendants' patients. By at least the beginning of 2016, the Defendants promoted her to clinical

coordinator. In this role, she oversaw other nurses who rendered peritoneal home dialysis service, as well as continuing to perform those tasks herself.

44. During all material times, the Defendants employed another nurse, Heather Clark, to oversee Nurse Lapworth. During all material times, the Defendants employed a nurse, Nancy Landrieu, to oversee Nurse Clark and Nurse Lapworth.

45. The Defendants hired Relator as a registered nurse to provide self-care home peritoneal dialysis support at this clinic on February 29, 2016. The documents that her employer provided to her described her employer as "Fresenius Medical Care." Other documents described the Facility as "Fresenius Medical Care City Home Program," "Crescent City Home Therapy," or Crescent City Home Therapies Department." Renal Care Group, Inc. and Bio-Medical Applications of Louisiana New Orleans, each, sent her W-2 forms for her 2016 compensation for her work at the Facility.

46. During her employment, Relator discovered that Defendants were involved in an ongoing scheme of filing false claims for Medicare reimbursement.

47. Defendants have been knowingly submitting false claims to Medicare, TRICARE/CHAMPUS and other government healthcare programs through a variety of improper schemes, including but not limited to (1) falsely stating the volume of urine in the patient's 24-hour urine collection, (2) falsely stating the weight of the patient's ultrafiltration bags, (3) changing the IQ driving settings that control the amount of solution that enters the patient's body contrary with doctor's orders or what is reflected in the computer systems, (4) falsely stating patient's causes of death, and (5) continuing patients on dialysis beyond their doctor's orders. These false statements lead to false Kt/V adequacy

measurements and other false quality measurements that fraudulently conceal from HHS and CMS that the Facility is not achieving a performance score sufficiently high to avoid a deduction from pay.

48. Moreover, the false information conceals from the patient's doctors that the patients' dialysis is not performing adequately. Had these doctors been aware of the patients' condition, the doctors would have remove the patients from self-care home peritoneal dialysis and sent them to in-center dialysis. Continuing such patients in self-care home peritoneal dialysis was therefore medically unnecessary and defrauded Medicare, TRICARE/CHAMPUS, and other government healthcare programs out of money.

49. Relator has continuously brought these fraudulent schemes to the attention of her superiors, specifically Nurse Clark, Nurse Landrieu, and the Defendants' compliance department. The superiors, however, continually rebuffed Relator.

50. Nurse Lapworth directly participates in these fraudulent schemes and instructed other nurses to enter false information. On information and belief, Nurse Clark and Nurse Landrieu and aware of and condone Nurse Lapworth's fraudulent activities. The Defendants gave Nurse Lapworth, Nurse Clark, Nurse Landrieu, and other nurses in its employ financial incentives to make the adequacy values meet or exceed the 1.7 Kt/V threshold, regardless of the actual data showing the patients' condition and health. Specifically, the Defendants tied potential bonuses to Nurse Lapworth, Nurse Clark, Nurse Landrieu, and other nurses in its employ to the Facilities "Ultra Score" that is commensurate with the Facilities total performance score under CMS's rules.

## SPECIFIC EXAMPLES OF FRAUDULENT ACTIVITY

51. Below are specific examples of these fraudulent schemes. Patient names, however, have not been included in the complaint for privacy reasons.[2] The Relator has direct and independent knowledge of each of these examples.

52. In approximately September of 2016, Patient No. 1's urine volume was very low and his Kt/V would have been below the threshold where he would be sent to in-center treatment. Complainant personally saw Nurse Lapworth entered a higher volume of urine into the computer system so that his Kt/V score would be higher and he would remain as an outpatient. Patient No. 1 passed away in November of 2016.

53. In January of 2017, Relator weighed Patient No. 2's ultrafiltration bags and their weights were low, which would have resulted in a low Kt/V score. Relator entered this information into the computers on the date Patient 2 came into the Facility. Nurse Lapworth emailed Relator a day or two later, instructing Relator to change the information in the computer from the number shown on the scale and instead use numbers from the IQ drive that flow meters on the dialysis machines generate while they are operating at the patient's home. This would have resulted in a falsely high Kt/V. Nurse Lapworth "wrote up" Relator for this incident.

---

[2] Relator has not disclosed the names or other identifiable information regarding the specific Medicare and other government healthcare beneficiaries mentioned in this complaint. This information relating to the beneficiaries is in the possession of Relator's counsel and will be disclosed upon request by this Court and/or the Government.

54. Patient No. 3's lab values showed he was unstable in either late December-2016 or early January-2017. On January 9, 2017, his doctor order the Defendants' nurses to increase the patient's IQ drive volumes. Relator complied with this order on the IQ drive and recorded this in the Defendants' computer system. On January 17, Nurse Lapworth, without a doctor's order, changed the IQ drive to even higher volumes, but did not change the order in the computer. Having the volume different from what appeared in the computer records would change the Kt/V calculations so that they would appear larger than reality. Patient No. 3 returned to the clinic on January 19. Nurse Lapworth changed his IQ drive to increase the "fills," which are the number of times the dialysis machine will run during the night, from five to six. However, she modified the orders in the computer system to say only five fills. This difference caused the patient to show greater Kt/V values than reality.

55. In October of 2016, Nurse Lapworth adjusted Patient No. 4's IQ drive setting for "dwell time" inconsistent with his doctor's orders or the computer system. Having a different dwell time affects the volume of fluid and the resulting Kt/V score. This difference caused the patient to show greater Kt/V values than reality.

56. In November of 2016, Nurse Lapworth adjusted Patient No. 5's IQ drive setting for dwell time inconsistent with his doctor's orders or the computer system. This difference caused the patient to show greater Kt/V values than reality.

57. From 2014 through the present, Nurse Lapworth adjusted Patient No. 6's IQ drive dwell time and volume settings inconsistent with his doctor's orders or the computer system. This difference caused the patient to show greater Kt/V values than reality.

58. In May and June of 2016, Nurse Lapworth adjusted Patient No. 7's dwell time and volume settings in the computer system inconsistent with his doctor's orders or the IQ drive. This difference caused the patient to show greater Kt/V values than reality.

59. Between September 7 and October 13, 2016, Nurse Lapworth adjusted Patient No. 8's dwell time and volume settings on his IQ drive inconsistent with his doctor's orders and the computer system. This difference caused the patient to show greater Kt/V values than reality. Patient No. 8 passed away on November 15, 2016.

60. Beginning on November 17, 2015, Nurse Lapworth adjusted Patient No. 9's fill settings on her IQ drive inconsistent with her doctor's orders and the computer system. This difference caused the patient to show greater Kt/V values than reality.

61. Patient No. 9 passed away on or about January 1, 2017. The patient's doctor orally notified Relator that Patient No. 9 died from sepsis and peritonitis. The hospital where the patient died had records indicating the same cause of death for Patient No. 9. Sepsis and peritonitis are signs that the quality of the Defendants' prior renal care was of poor quality. On January 2, 2017, Relator entered this correct cause of death information onto forms required when an ESRD patient passes. Later the same day, Nurse Lapworth falsely changed the cause of death to things that would not reflect that the dialysis service was poor. This change avoided a Medicare payment reduction, like the way the falsely higher Kt/V measurements avoided reductions.

62. Patient No. 10's doctors ordered that the Defendants hold his peritoneal dialysis on February 6, 2017. Nurse Lapworth disregarded this order and continued Patient No. 10 on

peritoneal dialysis until March 31, 2017. The Defendants submitted a claim for this additional, medically unnecessary dialysis.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(l) (1990)/31 U.S.C. § 3729(a)(l)(A) (2009)

63. Relator incorporates all the preceding allegations.

64. As set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(l) (1990) and 31 U.S.C. § 3729(a)(l)(A) (2009).

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(3) (1990)/31 U.S.C. § 3729(a)(l)(C) (2009)

65. Relator incorporates all the preceding allegations.

66. By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

67. This is a claim for civil penalties and treble damages under the False Claims Act.

68. By the acts described above, Defendants have knowingly conspired together to defraud the Federal Government by engaging in conduct including, but not limited to, billing government healthcare programs for medically unnecessary services and equipment.

69. Defendants' conspiracy defrauded the United States by causing or getting false or fraudulent claims allowed or paid.

70. As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729(a)(3) (1990) and 31 U.S.C. § 3729(a)(l)(C) (2009) and have thereby damaged and continue to

damage the United States Government by their actions in an amount to be determined at trial.

## COUNT III
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(7) (1990)/31 U.S.C. § 3729(a)(l)(G) (2009)

71. Relator incorporates all the preceding allegations.

72. As set forth above, Defendants knowingly made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7) (1990) and 31 U.S.C. § 3729(a)(l)(G) (2009).

73. By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

**WHEREFORE**, the United States and Relator demand that the Court enter judgment against the Defendants and in favor of the Relator and the United States for the amount of the United States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law.

Further, Relator demands that the Court awarded her the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d).

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully Submitted:

Attorneys for Cheri Talamo, Realtor

JOHN A. VENEZIA (#23963)
johnvenezia@venezialaw.net
JULIE O'SHESKY (#36245)
julieoshesky@venezialaw.net
Venezia & Associates (APLC)
757 St. Charles Avenue
Suite 302
New Orleans, LA 70130
(504) 486-3910 voice
(504) 486-3913 fax
-and-
DAVID C. CLEMENT (#23687)
dcc@clementgate.com
LESLIE J. HILL (#32157)
ljh@clementgate.com
Clement, Gates & May
400 Poydras Street
Suite 1410
New Orleans Louisiana 70130
(504) 598-2220 voice
(504) 598-2221 fax