UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA *ex rel.* CHERI TALAMO

VERSUS

FRESENIUS MEDICAL CARE HOLDINGS, INC., et al.

CIVIL ACTION

NO. 17-3509

SECTION M (2)

## ORDER & REASONS

Before the Court is a motion for summary judgment filed by defendants Fresenius Medical Care Holdings, Inc., Spectra Laboratories, Inc., Bio-Medical Applications of Maryland, Inc., Bio-Medical Applications of Louisiana LLC, Fresenius Medical Care Louisiana Dialysis Group LLC, Renal Care Group, Inc., Bio-Medical Applications of Louisiana, Inc. ("Corporate Defendants" or "Fresenius"), and Melissa Lapworth, Heather Clark, and Nancy Landrieu ("Individual Defendants") (collectively, "Defendants"),[1] to which relator Cheri Talamo ("Talamo") responds in opposition,[2] and in further support of which Defendants reply.[3] Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

## I.    BACKGROUND

This *qui tam* relator action arises out of Talamo's employment as a registered nurse to provide self-care home peritoneal dialysis, a type of renal dialysis that treats end stage renal disease covered by Medicare and other government healthcare programs under 42 U.S.C. § 1395rr(b)(14)(B).[4] Renal dialysis is an artificial process that replaces a failing kidney's function, including extracting waste from blood, balancing body fluids, and forming urine. Generally, renal

---

[1] R. Doc. 84.
[2] R. Doc. 93.
[3] R. Doc. 98.
[4] R. Doc. 33 at 6-7, 9, 12.

dialysis is adequate if it achieves nearly the same level of function as a natural kidney. The measurement of dialysis adequacy is represented as a value of "Kt/V."[5] Low levels of the Kt/V measurement are dangerous to a patient's health.

Congress enacted the end stage renal disease program in 42 U.S.C. § 1395rr to provide Medicare coverage for renal dialysis services. Subsection (h) creates financial incentives for such providers to deliver quality services. The Secretary of the Department of Health and Human Services ("HHS") monitors the quality of renal dialysis services of each provider to determine a total performance score. If a provider does not meet or exceed a set score, its Medicare payments may be reduced by up to 2.0%. Further, HHS established a standard of 1.70 Kt/V as the level for adequate renal dialysis. In order to receive Medicare reimbursement, a provider must submit a claim reporting its patients' Kt/V levels.[6]

Talamo alleges that her employers, Fresenius Medical Care Holdings, Inc., and its subsidiaries (Corporate Defendants for purposes of this motion),[7] offered peritoneal dialysis in a patient's home, which was administered by a nurse, such as Talamo, trained to use the dialysis equipment properly. A machine inserts a dialysate solution into a port surgically implanted in a patient's body. Waste products produced from the dialysis process called peritoneal dialysate then

---

[5] The National Institute of Diabetes and Digestive and Kidney Diseases explains the Kt/V measurement this way:

Kt/V is another way of measuring dialysis adequacy. In this measurement,
- K stands for the dialyzer clearance, the rate at which blood passes through the dialyzer, expressed in milliliters per minute (mL/min)
- t stands for time
- Kt, the top part of the fraction, is clearance multiplied by time, representing the volume of fluid completely cleared of urea during a single treatment
- V, the bottom part of the fraction, is the volume of water a patient's body contains

*Hemodialysis Dose & Adequacy*, NATIONAL INSTITUTE OF DIABETES & DIGESTIVE & KIDNEY DISEASES, https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/hemodialysis/dose-adequacy (last visited July 3, 2019).

[6] *See* R. Doc. 33 at 7-8.

[7] R. Doc. 56-1 at 5.

collect in bags. The machine monitors the volume of peritoneal dialysate expelled and adjusts the volume of dialysate solution allowed into the body through an "IQ drive," a thumb drive which controls the number and volume of "fills" each night the machine runs. Patients purchase the dialysate solution from Corporate Defendants, which are paid by reimbursement from Medicare and other governmental healthcare agencies.[8]

Peritoneal-dialysis patients periodically come into the Corporate Defendants' facility in Metairie, Louisiana, to receive a check-up. Every three months, a patient provides nurses, such as Talamo, with urine collected in the past 24 hours and the previous night's bags of peritoneal dialysate. On some occasions, nurses use scales and rulers to take several measurements, including the patient's weight, height, urine volume, and bag weight. On others, nurses use data recorded on a patient's IQ drive to report such measurements.[9] They write down the results on what Talamo calls "adequacy checklists" and enter them in the Corporate Defendants' computer system, which stores a patient's chart and calculates the Kt/V adequacy measurement.[10] The Corporate Defendants then submit this information to governmental health agencies and insurance companies to receive reimbursement. This information is also used by the patients' physicians to make decisions about patient care, such as adjusting the volume of solution or removing a patient from home dialysis.

Talamo alleges that the Individual Defendants were employees of Corporate Defendants and were Talamo's supervisors. Melissa Lapworth, who oversaw a group of nurses that provided at-home dialysis service and also performed these services herself, was Talamo's immediate

---

[8] R. Doc. 33 at 9-10.
[9] R. Docs. 84-3 at 3-4, 11 & 84-43 at 3-4, 11.
[10] R. Doc. 93-1 at 3.

supervisor.  Lapworth's immediate supervisor, in turn, was Heather Clark, and Clark's supervisor was Nancy Landrieu.[11]

Talamo alleges that she witnessed her supervisor Lapworth knowingly entering false information into the computer system to maximize the payments received from Medicare.  Talamo lists eleven incidents of allegedly fraudulent activity, including, for example, several occasions where Lapworth adjusted patients' time and volume settings on the computer system inconsistent with their doctors' orders or IQ drive output, causing patients to use and order additional and medically unnecessary bags of dialysate solution.  On some occasions, patients died shortly after the alleged tampering.  On others, Talamo alleges that Lapworth revised the levels or cause of death that Talamo had recorded, effectively concealing poor dialysis service. Talamo also claims that the Corporate Defendants gave the Individual Defendants and other nurses bonuses to meet or exceed the 1.70 Kt/V adequacy threshold, regardless of the patient's actual data and condition, so as to inflate their performance score for purposes of Medicare reimbursement.[12]  Such conduct, Talamo asserts, amounted to a conspiracy among Defendants to defraud Medicare and other governmental healthcare agencies to pay for greater amounts of dialysate solution than was medically necessary and that would otherwise not be covered due to Corporate Defendants' poor performance score.[13]

Talamo claims that she reported the fraudulent activity to the Individual Defendants but was continually rebuffed by them.[14]  As a result, Talamo says Defendants retaliated against her. In January 2017, Individual Defendants called several meetings with Talamo and other employees,

---

[11] R. Doc. 33 at 6, 11-12.  The Defendants say that Talamo and the Individual Defendants are all employees of defendant Bio-Medical Applications of Louisiana, LLC d/b/a Fresenius Medical Care Crescent City Home Program.  R. Doc. 56-1 at 2-3.
[12] R. Doc. 33 at 12-17.
[13] *See id.* at 12-13.
[14] *Id.* at 13, 18.

during which Talamo was accused of being unhelpful and uncooperative. Talamo alleges that Lapworth and Clark threatened another employee, Miriam Quick, with the loss of her job if she did not act aggressively towards Talamo at these meetings.[15] Talamo also alleges that Lapworth and Clark issued two "corrective action forms" that falsely accused her of wrongdoing. Thereafter, on February 1, 2017, Talamo reported Lapworth's conduct to Fresenius' internal investigation board and attached copies of the adequacy checklists allegedly altered by Lapworth.[16] The internal investigation board found "no evidence to support the reporter's allegation that the clinical coordinator sought to intentionally falsify adequacy numbers or that she was retaliated against for reporting these concerns."[17] In mid-February 2017, Talamo sent written complaints to the Louisiana State Board of Nursing and the Louisiana Department of Health and Hospitals ("DHH").[18] In her complaint to the Louisiana State Board of Nursing, Talamo again attached copies of the allegedly altered adequacy checklists[19] and requested that Lapworth be disciplined for:

1. Failing to practice nursing in accordance with the legal standards of nursing practice;

2. Failing to utilize appropriate judgment;

3. Performing procedures beyond the authorized scope of nursing or any specialty thereof;

4. Falsifying records;

5. Failing to act, or negligently or willfully committing acts, that adversely affect the physical or psychological welfare of the patient, including but not limited to, failing to practice in accordance with the Federal Disease Control recommendations for preventing transmission of Hepatitis B Virus (HBV); and

---

[15] R. Doc. 93 at 11-12 (citing R. Doc. 93-19 at 33-37, 163-169).
[16] R. Docs. 84-21 at 127-28 & 84-44.
[17] R. Doc. 84-44 at 4.
[18] R. Docs. 84-46 & 84-47.
[19] R. Doc. 84-21 at 127-28.

6. Inappropriate, incomplete or improper documentation.[20]

The investigator from the Louisiana State Board of Nursing informed Lapworth that the investigation was closed. Lapworth never received documentation thereafter relating to the complaint, and the Louisiana State Board of Nursing has not taken any action against her.[21]

On August 21, 2017, the Louisiana State Board of Nursing noted in its file relating to the investigation of Lapworth that the DHH survey in March 2017 had concluded that Talamo's "allegations were not valid."[22] Nonetheless, the DHH investigation of the Metairie facility found deficiencies under federal regulations.[23] For example, the DHH report noted that "the facility failed to ensure staff followed physician peritoneal dialysis treatment orders for three of seven sampled patients reviewed for following physician orders in a total of eleven sampled patients."[24] Landrieu testified in her deposition that she disagreed with the noted deficiencies because she and Lapworth had worked together to correct what they perceived to be a problem entering the data.[25]

In March 2017, Corporate Defendants reassigned Talamo from their facility in Metairie to a facility on the West Bank for approximately three months.[26] As a result, Talamo claims that she was demoted to perform the tasks of a technician rather than a registered nurse and that she was burdened by the commute.[27] Defendants, on the other hand, contend that Talamo was required to be assigned temporarily to the West Bank facility in order to receive hemodialysis training.[28]

---

[20] R. Doc. 84-46 at 6.
[21] *See* R. Doc. 84-22 at 34-35.
[22] R. Doc. 84-45 at 3.
[23] *See* R. Doc. 93-21 at 28-38.
[24] R. Docs. 84-23 at 20-21 & 93-21 at 17, 28-38.
[25] *Id.*
[26] R. Docs. 33 at 18-19 & 84-21 at 54-55.
[27] R. Doc. 33 at 18-19.
[28] R. Docs. 84-3 at 24 & 84-43 at 24. Home hemodialysis is one of two modalities (the other being peritoneal dialysis) for allowing home dialysis patients to administer treatments at home themselves or with the assistance of family members. In hemodialysis, a dialysis machine is used to remove blood from the body, filter it through a manufactured membrane, and return it to the body. R. Docs. 84-5 at 5; 84-6 at 5.

Landrieu testified in her deposition that all nurses who had no hemodialysis experience were required to be trained "at some point," and that the decision to train Talamo at that time related to the timing of Talamo's hiring rather than to Talamo's complaints to state agencies.[29] Talamo admitted she had no prior experience in hemodialysis.[30] But even after Talamo completed the three-month training on the West Bank, she testified that she then "went to the home therapy clinic in Metairie for a day here, on the West [B]ank for a day, kind of flipped around, and then went to the West [B]ank clinic."[31]

Talamo alleges that on or about June 8, 2017, she spoke with an officer from the U.S. Inspector General's Office about the content of her complaint to the DHH.[32] During the summer of 2017, Defendants issued three additional corrective action forms against Talamo, which she claims contain false allegations, and Talamo's supervisors texted her after hours to schedule meetings that pulled her away from her normal duties and inconvenienced her commute. Further, Defendants allegedly delayed in paying Talamo mileage reimbursement and refused to pay for her travel time.[33] Yet, Talamo testified in her deposition that she has been fully compensated for mileage reimbursement and admitted that she never submitted a documented request in accordance with Fresenius' policy for travel time compensation.[34] Talamo also complained about not receiving a bonus for having referred Dana Ascani-Grassette to Fresenius for hire as an employee, who started in March 2016.[35] However, Ascani-Grassette had not named Talamo on her application, and Talamo had only brought the issue to the attention of Fresenius personnel in

---

[29] R. Doc. 84-23 at 25-26.
[30] R. Doc. 84-21 at 56.
[31] *Id.* at 55.
[32] R. Doc. 33 at 20.
[33] *Id.* at 20-21.
[34] R. Docs. 84-3 at 25 & 84-43 at 25 (citing R. Doc. 84-21 at 82-83, 98-101).
[35] R. Docs. 84-3 at 26 & 84-43 at 26 (citing R. Docs. 84-31 at 51; 84-35).

December 2016.[36]   Talamo was informed that, in November 2016, the company policy changed the amount of the bonus from \$2,000 to \$1,500.[37]   Although she was eventually paid \$1,500, Talamo maintains she is owed an additional \$500 for the referral.[38]   Talamo further alleges that the Corporate Defendants' acts of retaliation caused her to take an emergency, unpaid leave of absence in August 2017, and that Corporate Defendants wrongly terminated her benefits in December 2017.  Finally, Talamo alleges that Defendants' actions caused her mental anguish and anxiety for which she has sought medical treatment.[39]   Talamo reported sleeplessness to her general practitioner for which she received medication.[40]

In her second supplemental and amending complaint, Talamo brought six counts against Defendants.[41]   Following the Court's Order & Reasons granting in part Defendants' motion for judgment on the pleadings, and ahead of the instant motion, the following claims remained pending.[42]   First, Talamo alleges that Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to officials of the United States Government ("Government") in violation of 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act ("Count I").[43]   Second, Talamo alleges that the Corporate Defendants retaliated against her in violation of 31 U.S.C. § 3730(h)(2) and 42 U.S.C. § 1981a(b)(1) ("Count IV").[44]   Third, Talamo alleges that Corporate Defendants retaliated against her in violation of the Louisiana Whistleblower Statute, La. R.S. 23:967 ("Count V").[45]   Fourth, Talamo asserts that Defendants intentionally inflicted

---

[36] R. Docs. 84-34 & 84-35.
[37] R. Docs. 84-3 at 26 & 84-43 at 26 (citing R. Doc. 84-21 at 91-92).
[38] R. Docs. 84-3 at 25 & 84-43 at 25 (citing R. Docs. 84-21 at 62 & 84-29).
[39] R. Doc. 33 at 20-21.
[40] R. Doc. 84-21 at 51-52.
[41] R. Doc. 33.
[42] R. Doc. 91.
[43] R. Doc. 33 at 21.
[44] *Id.* at 23.
[45] *Id.* at 23-25.

emotional distress upon her under Louisiana tort law, that Clark and Lapworth are solidarily liable for having conspired under Louisiana Civil Code article 2324(A), and that Corporate Defendants are vicariously liable for their employees' tortious actions ("Count VI").[46]

## II. PENDING MOTION

In their motion for summary judgment, Defendants argue that insufficient evidence exists to support Talamo's allegations under the False Claims Act.[47] Talamo concedes that she cannot maintain any of her federal claims and voluntarily dismisses Counts I and IV.[48] However, Talamo contends that disputed issues of material fact preclude summary judgment on her remaining state-law claims.[49]

Defendants argue that Talamo's claim under the Louisiana Whistleblower Statute should be dismissed because Talamo does not provide evidence that Fresenius violated any state law but only alleges that her co-worker Lapworth did.[50] Defendants note that Talamo admitted in her deposition that she cannot produce any documentation of Lapworth's alleged alterations of measurements listed in the adequacy checklists,[51] and that Lapworth denies having falsified such information or having instructed others to do so.[52] Defendants also assert that the DHH auditors found no violation of any state law after investigating the Metairie facility in March 2017.[53] Because the absence of an employer's violation of state law is fatal to a claim under the Louisiana

---

[46] *Id.* at 25-27.
[47] R. Docs. 84-4 at 9-22 & 84-42 at 9-22.
[48] R. Doc. 93 at 3. Specifically, Talamo stated: "relator is no longer going to pursue her claims based on federal law that she alleged in Counts I, II, II [sic], and IV." In her opposition to the Defendants' motion for judgment on the pleadings, Talamo waived her cause of action in Count III. R. Doc. 57 at 2. As a result, the Court dismissed Count III in its prior Order & Reasons. R. Doc. 91 at 11. The Court also dismissed Count II and amended Count I to seek the remedy pleaded in Count II. *Id.* Therefore, ahead of her opposition to the instant motion for summary judgment, Talamo's only remaining federal allegations had been Counts I and IV.
[49] R. Doc. 93 at 1, 4-17.
[50] R. Docs. 84-4 at 22-23 & 84-42 at 22-23.
[51] R. Docs. 84-4 at 23 & 84-42 at 23 (citing R. Docs. 84-3 at 18 & 84-43 at 18).
[52] R. Doc. 84-3 at 18 & 84-43 at 18.
[53] R. Docs. 84-4 at 23 & 84-42 at 23 (citing R. Docs. 84-3 at 17 & 84-43 at 17).

Whistleblower Statute, Defendants submit that Talamo's claim fails as a matter of law.[54] Defendants further contend that Talamo's claim also fails because her alleged grievances do not amount to actionable reprisal. Instead, Defendants describe Talamo's temporary and required reassignment to a facility to receive hemodialysis training, her referral bonus, the delayed payment of her mileage reimbursement, and her expected attendance at company meetings as justifiable or *de minimis* conduct that does not constitute materially adverse employment actions.[55] But even if her allegations were actionable, Defendants argue that Talamo cannot show a causal link between her complaints and any alleged retaliatory act.[56] Rather, Defendants suggest that Talamo's hemodialysis training was necessary for the performance of her job, that Fresenius helped resolve her compensation-related complaints, and that she has no evidence that the criticisms of her performance were unwarranted.[57]

Defendants next contend that Talamo's claim for intentional infliction of emotional distress should be dismissed because Defendants exhibited no extreme or outrageous conduct, Talamo experienced no severe distress, and Talamo has shown no evidence of intent.[58] Defendants characterize Talamo's complaints as mere annoyances typical of the workplace.[59] Furthermore, Defendants note that Talamo's medical records do not indicate that she experienced severe emotional distress, given that the records consistently reflect Talamo was experiencing no anxiety, panic, or depression, and that Talamo has not seen a mental health specialist or received hospitalization for any conditions related to this lawsuit.[60] Finally, Defendants claim that Talamo submits insufficient evidence to show any of them intended to inflict emotional distress upon her,

---

[54] R. Docs. 84-4 at 23 & 84-42 at 23.
[55] R. Docs. 84-4 at 21-22 & 84-42 at 21-22 (citing R. Docs. 84-3 at 25-27 & 84-43 at 25-27).
[56] R. Docs. 84-4 at 23 & 84-42 at 23.
[57] R. Docs. 84-4 at 22 & 84-42 at 22 (citing R. Docs. 84-3 at 24-26 & 84-43 at 24-26).
[58] R. Docs. 84-4 at 24-27 & 84-42 at 24-27.
[59] R. Docs. 84-4 at 24-25 & 84-42 at 24-25.
[60] R. Docs. 84-4 at 25 & 84-42 at 25 (citing R. Docs. 84-3 at 27-28 & 84-43 at 27-28).

citing Talamo's deposition testimony where she acknowledged that Fresenius personnel other than the Individual Defendants treated her fairly.[61]

In opposition, Talamo asserts that her claim under the Louisiana Whistleblower Statute should not be dismissed because she points to evidence of violations of Louisiana Revised Statutes 37:1271(A) (governing license to practice medicine),[62] section 8461 of title 48 of the Louisiana Administrative Code (regulations concerning patient records for end stage renal disease treatment facilities),[63] and section 3405 of title 46 of the Louisiana Administrative Code (regulations concerning disciplinary proceedings for registered nurses).[64] In addition to her deposition

---

[61] R. Docs. 84-4 at 26 & 84-42 at 26 (citing R. Docs. 84-3 at 15 & 84-43 at 15).

[62] "No person shall practice medicine as defined herein until he possesses a duly recorded license issued under this Part or a permit or registration as provided for herein." La. R.S. 37:1271(A).

[63] Talamo relies on the following provisions of section 8461:

The facility is required to maintain a clinical record according to current professional standards for each patient.
1. This record shall:
   a. contain all pertinent past and current medical, psychological, social and other therapeutic information, including the treatment plan;
   b. be protected from unauthorized persons, loss, and destruction; and
   c. be a central location for all pertinent patient information and be easily accessible to staff providing care.
   ….
6. Contents. Patient records shall accurately document all treatment provided and the patient's response in accordance with professional standards of practice. The minimum requirements are as follows:
   a. admission and referral information, including the plan/prescription for treatment; …
   d. physician's orders; …
   f. treatment plan. The plan is a written list of the patient's problems and needs based on admission information and updated as indicated by progress or lack of progress. Additionally, the plan shall:
   …
      vi. be followed consistently by all staff members; and
      vii. contain complete, pertinent information related to the mental, physical, and social needs of the patient.
   g. diagnostic laboratory and other pertinent information, when indicated; …
   i. other pertinent information related to the individual patient as appropriate.
7. Computer data storage of pertinent medical information must:
   a. meet the above criteria;
   b. be easily retrievable and accessible when the patient is receiving dialysis; and
   c. be utilized by care givers during dialysis treatment.
La. Admin. Code tit. 48, § 8461(A); R. Doc. 93 at 6.8.

[64] Talamo relied on the following provisions of section 3405:

The board in the exercise of its disciplinary authority has adopted the following meaning for the following terms.

testimony, Talamo offers the DHH's findings in its March 2017 investigation that stated the Metairie facility "failed to ensure staff followed physician peritoneal dialysis treatment orders."[65] Talamo further claims that both Lapworth and Landrieu testified in their depositions that the Metairie facility had improper documentation.[66] Talamo regards the missing adequacy checklists with suspicion and suggests that the DHH investigation was incomplete because it could not have assessed this missing evidence.[67] To fill the gap of proof concerning her allegation of the falsification of records, Talamo submits the sworn testimony of co-worker Ascani-Grassette, which states that Lapworth instructed her to enter incorrect urine volumes and that she observed two instances of discrepancies between information entered in Lapworth's adequacy checklists and the data recorded on computer equipment.[68]

Talamo also contends she has shown that Corporate Defendants have alienated her through conduct recognized by the Fifth Circuit as reprisal in *Haire v. Board of Supervisors of Louisiana State University Agricultural & Mechanical College*, 719 F.3d 356, 367 (5th Cir. 2013). Talamo submits the recording of a conversation between herself and co-worker Quick, in which Quick states that she "felt [Clark] was trying to pit [Quick] against [Talamo]" in a meeting.[69] Talamo next submits her own deposition testimony to assert that Clark and Lapworth instructed a co-worker to make false allegations against Talamo, that the corrective action forms were false, that

---

*Other Causes*—includes, but is not limited to: …
    f. performing procedures beyond the authorized scope of nursing or any specialty thereof; …
    h. improper use of drugs, medical supplies or equipment, patient's records, or other items; …
    j. falsifying records;
    k. failure to act, or negligently or willfully committing any act that adversely affects the physical or psychosocial welfare of the patient … ; …
    p. inappropriate, incomplete or improper documentation ….
La. Admin. Code tit. 46, § 3405(A); R. Doc. 93 at 8-10.

    [65] R. Doc. 93 at 9 (citing R. Doc. 93-21 at 17, 28-38).

    [66] *Id.* (citing R. Docs. 93-19 at 73, 81-82, 91-92 & 93-21 at 19-20).

    [67] *Id.* at 9-10.

    [68] *Id.* (citing R. Docs. 93-22 at 53, 64, 71-81, 84-85, 92, 97-98, 100-103, 222-232; & 93-23 at 9-11).

    [69] *Id.* at 11-12 (citing R. Doc. 93-19 at 33-37, 163-169).

Talamo was relocated to work as a technician rather than a registered nurse for three months, that Individual Defendants were aware that Talamo desired to work in Metairie in order to be close to her minor children, and that moving her to a clinic on the West Bank "ended a central benefit to [Talamo] in having this job."[70]  In addition to her own deposition testimony, Talamo submits the sworn testimony of Ascani-Grassette, which characterizes Individual Defendants' reaction to Talamo's report about Lapworth as "a slow progression" of making Talamo's job "very difficult" for her, from threatening "a stack of write-ups" to being "let … go."[71]

In opposing the dismissal of her intentional infliction of emotional distress claim, Talamo argues that Defendants acted outrageously when Clark directed Quick to be verbally aggressive towards Talamo in a meeting.  Talamo further claims she suffered extreme distress because her medical records indicate that she was unable to sleep due to work-related stress, and because Talamo sought medical treatment and drugs to address her stress and sleeplessness.[72]  Finally, Talamo argues that Quick's recorded statement shows that Clark intended to intentionally inflict emotional distress upon Talamo.[73]

In reply to Talamo's arguments, Defendants maintain that Talamo did not produce competent evidence demonstrating that her employer, as opposed to her co-worker, violated state law.  Defendants also emphasize that Talamo's citation to the DHH findings cannot prove an actual violation of state law because the DHH surveyed only federal, rather than state, regulations.[74]  Finally, Defendants re-urge the same reasons for dismissal of Talamo's claim for intentional infliction of emotional distress.[75]

---

[70] *Id.* at 13 (citing R. Docs. 93-16 & 93-17).
[71] *Id.* at 14 (citing R. Docs. 93-22 at 46-76 & 93-23 at 7-9, 35).
[72] *Id.* at 16 (citing R. Doc. 93-10 at 3-4).
[73] *Id.* at 16-17.
[74] R. Doc. 98 at 2-7.
[75] *Id.* at 7-11.

### III. LAW & ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may

not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. Analysis

The parties agree that Talamo has conceded certain claims and they should be dismissed, including the remaining federal claims in Counts I and IV. As a result, they are hereby dismissed.[76] The Court now turns to the issues that remain in dispute.

#### 1. Retaliation under Louisiana Whistleblower Statute (Count V)

In Count V, Talamo seeks relief under the Louisiana Whistleblower Statute, La. R.S. 23:967(A), which prohibits an employer from taking "reprisal against an employee who in good faith, and after advising the employer of the violation of law":

> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

"The Whistleblower Statute provides protection to employees against reprisal from employers for reporting or refusing to participate in illegal work practices." *Accardo v. La. Health Servs. & Indem. Co.*, 943 So. 2d 381, 383 (La. App. 2006) (citing *Hale v. Touro Infirmary*, 886 So. 2d 1210, 1214 (La. App. 2004)). To prevail on a claim under the Whistleblower Statute, a plaintiff must establish that (1) her employer violated Louisiana law through a prohibited workplace act or practice; (2) she advised the employer of the violation; (3) she then refused to participate in the prohibited practice or threatened to disclose the practice; and (4) she was terminated as a result of

---

[76] Following the dismissal of all federal claims over which the Court had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c). In the interest of judicial economy, the Court chooses to retain supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

her refusal to participate in the prohibited practice, her disclosure of the prohibited practice, or her threat to disclose the practice. *Hale*, 886 So. 2d at 1216.

In analyzing retaliation claims under the Louisiana Whistleblower Statute, Louisiana courts apply the test and burden-shifting framework announced in *McDonnell Douglas* for federal retaliation claims under Title VII. *See Haire*, 719 F.3d at 364 n.7 (citing *Smith v. AT&T Sols., Inc.*. 90 F. App'x 718, 723 (5th Cir. 2004)) & 367 n.14. Accordingly, a plaintiff must first make a *prima facie* case that (1) plaintiff engaged in protected activity; (2) plaintiff suffered an adverse employment action; and (3) a causal connection existed between the activity in which the plaintiff engaged and the adverse action. *Gaspard v. Betchel Oil, Gas & Chems. Constr. Servs., Inc.*, 2018 WL 2671230, at *3 (M.D. La. June 4, 2018). Thus, it is first essential that a plaintiff demonstrate that she engaged in activity protected by the Whistleblower Statute, including "establish[ing that] the employer engaged in workplace conduct constituting an actual violation of state law," *Encalarde v. New Orleans Ctr. for Creative Arts/Riverfront*, 158 So. 3d 826, 826 (La. 2015) (citing *Accardo* and *Hale*), and that she advised the employer of the state-law violation. The second element of a retaliation claim may be satisfied by a showing of "reprisal" as it is defined under the statute, which includes "firing, layoff, loss of benefits, or any other discriminatory action" taken as a result of a protected activity. La. R.S. 23:967(C)(1). A reprisal may also be shown by satisfying the test for an adverse employment action in Title VII retaliation claims, such that "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006); *see Haire*, 719 F.3d at 367 & n.14, 368. Third, a causal connection may be established by close timing of the protected activity and the alleged reprisal. *See Haire*, 719 F.3d at 368. Once the plaintiff makes a *prima facie* case, the burden shifts to the defendant to demonstrate legitimate reasons for its conduct. To avoid summary judgment,

the plaintiff must point to substantial evidence "show[ing] that the retaliation was a 'but for' cause of the adverse employment decision." *Id.* at 368-69 (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4, 308 (5th Cir. 1996)).

Defendants argue that this case involves nothing more than a soured employment relationship between Talamo and a lone co-employee, Lapworth, that turned into a personal vendetta against Lapworth. Obversely, Talamo argues that she is the quintessential whistleblower seeking to bring to heel a law-breaking employer. Corporate Defendants assert that Talamo's allegations of Lapworth's violations of law, even if supported by adequate summary judgment evidence, would not establish that Corporate Defendants, as employer, actually violated any state law. Defendants cite *Odeh v. City of Baton Rouge*, 2017 WL 3726019, at *14 (M.D. La. Aug. 29, 2017), in urging that the Louisiana Whistleblower Statute "only covers serious violations committed by the employer, not the illegal acts of co-workers."[77] The court in *Odeh* held that an employer was not liable under the Louisiana Whistleblower Statute for an employee's criminal destruction of the employer's property where the plaintiff failed to provide evidence linking the employer's involvement in the crime. *See id.* at *14-15. There, the plaintiff theorized that the employer tampered with surveillance equipment to permit theft and destruction of property. The court granted summary judgment to the employer in part because the plaintiff failed to produce evidence of the employer's tampering with the surveillance equipment, and so failed to show that her employer actually violated a state law. *Id.*

The *Odeh* court relied upon *Goulas v. LaGreca*, 945 F. Supp. 2d 693, 703 (E.D. La. 2013), for the proposition that an employer is not liable for the criminal actions of its employees. 2017 WL 3726019, at *14 n.134. In *Goulas*, the court held that an employee who disclosed a co-

---

[77] R. Docs. 84-4 at 22 & 84-42 at 22.

worker's illegal use of drugs on the premises did not have a claim under the Louisiana Whistleblower Statute. 945 F. Supp. 2d at 702-03. Unlike the criminal activity in *Goulas*, Talamo's allegations relate to Lapworth's actions within the scope of her employment as an employee of Fresenius, which may make Fresenius vicariously liable for her conduct.[78] For example, in *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304 (5th Cir. 2015), the district court had dismissed the plaintiff's whistleblower claim because the allegations of state-law violations were only directed against the plaintiff's co-employees, and not his employer. The Fifth Circuit reversed, reasoning that plaintiff's allegations that the employer was aware of the co-employees' unlawful conduct, and that plaintiff had reported it to his supervisors, were sufficient to state a claim that the employer "violated state law through a prohibited workplace act." *Id.* at 306-07 ("Taken together, these facts make plausible the allegation that [the employer] authorized the fraudulent billing practices of which [plaintiff] complained … [they] constituted a violation of law.").

To withstand summary judgment, then, Talamo must show that Fresenius engaged in workplace conduct that actually violated state law. Corporate Defendants urge that Talamo "has no documentation proving her records were falsified."[79] Talamo theorizes that the unavailability of the adequacy checklists demonstrates her employer's attempt to conceal Lapworth's actions, but Talamo provides no evidence to support her theory. In fact, Talamo testified that she once had copies of the adequacy checklists allegedly altered by Lapworth, but these were submitted to Fresenius' internal investigation board and the Louisiana State Board of Nursing for investigation – both of which found Talamo's allegations to be unsupported. Thus, Corporate Defendants contend that Talamo lacks evidence to prove any state-law violation. In response, Talamo presents

---

[78] R. Doc. 33 at 24-25 (citing La. Civ. Code art. 2320).
[79] R. Doc. 96-2 at 5.

her own sworn testimony and the deposition testimony of friend and co-worker Ascani-Grassette that Lapworth altered patients' urine measurements and distributed dialysate solution without prescription – conduct Talamo says violates § 3405 of Louisiana's regulations concerning disciplinary proceedings for registered nurses.[80]  Talamo also notes that, pursuant to the March 2017 investigation, the DHH found the facility to have violated physicians' orders regarding peritoneal dialysis, a fact that Defendants do not contest but insist was unintentional – which the investigation also found.[81]  Nevertheless, Talamo says this conduct plainly violates the requirement to follow a patient's treatment plan under § 8461 of Louisiana's regulations concerning patient records for end stage renal disease treatment facilities.[82]  She also contends that Lapworth altered the cause of death for a patient.  Corporate Defendants explain that Lapworth did so believing it was for a doctor, not a nurse, to identify the cause of death.[83]

Talamo's summary judgment evidence, comprised as it is of her own testimony and that of a friendly co-worker inexperienced in dialysis, is thin at best.  Corporate Defendants characterize it as involving only charges of misconduct (rule breaking) by a single employee (Lapworth) even though Talamo simultaneously concedes that Fresenius wanted its employees to follow the rules.[84]  At most, say Corporate Defendants, Talamo's claims involve nothing more than "unintentional regulatory deficiencies that were swiftly corrected."[85]  They say an actionable claim under the

---

[80] Section 3405 lists actions that would subject registered nurses to disciplinary action by the Louisiana State Board of Nursing.  The board is responsible for imposing discipline, which is reviewable by Louisiana courts under the Administrative Procedure Act, La. R.S. 49:964(G).  Neither the Nurse Practice Act, La. R.S. 37:911, *et seq*., nor § 3405 itself, provides for a private right or cause of action for the proscribed conduct.  Nevertheless, to the extent Talamo's summary judgment evidence reveals such conduct, it would appear to satisfy the Louisiana Whistleblower Statute's requirement of a state-law violation.

[81] R. Docs. 84-3 at 17 & 84-43 at 17.

[82] As with § 3405, a showing of a § 8461 violation would appear to satisfy the Whistleblower Statute's requirement of a state-law violation, even though DHH is primarily responsible for the regulatory oversight, implementation, and enforcement of the regulations concerning end stage renal disease treatment facilities.

[83] R. Doc. 84-43 at 20.

[84] R. Doc. 98 at 3.

[85] *Id*. at 4.

Whistleblower Statute must involve more than someone doing something improper; it must involve a serious violation of state law.[86] There is much force in the position advanced by Corporate Defendants.[87] However, Talamo claims not only that Lapworth engaged in misconduct, but that her superiors turned a deaf ear to Talamo's complaints and sought to sweep them under the proverbial rug. These claims raise issues of employer involvement in the alleged state-law violations more like those at issue in *Richardson* than those in *Goulas*, which involved criminal conduct limited to a single co-employee. Talamo's charges of misconduct present serious consequences for dialysis patients, and her charges of her employer's role in responding to her complaints are equally serious. Hence, by the barest of margins, Talamo has presented evidence to turn back summary judgment at this juncture on the question whether Defendants violated state law.

Similarly, Talamo argues that she has raised a genuine dispute of material fact as to reprisal. As noted by the Fifth Circuit, the standard for defining adverse employment actions in retaliation claims under Title VII is broader than the same standard for discrimination claims under Title VII. *Haire*, 719 F.3d at 368 & n.17. The Supreme Court has instructed that retaliation claims should be analyzed in the context of an employee's particular circumstances. *Burlington*, 548 U.S. at 69; *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 707 (5th Cir. 2016). For instance, "[a]

---

[86] *Id.* at 2-4.

[87] The January 2017 incident provides an example. Talamo charges Lapworth with changing the recorded weight of an ultrafiltration bag, but Lapworth explains she did so because the bag had leaked during the patient's transit to the facility by public transportation. R. Doc. 84-43 at 11. Hence, Lapworth insists her aim was to provide more accurate information in order to gain a sounder measurement, while Talamo insists Lapworth falsified records. In addition, while Talamo also cites the DHH's findings as showing that Corporate Defendants "failed to ensure staff followed physician peritoneal dialysis treatment orders," the DHH reviewed Corporate Defendants' breach of federal, rather than state, law. R. Docs. 93-1 at 13-14 (summarizing survey findings citing 42 C.F.R. pt. 494) & 93-21 at 28-37. Consequently, Corporate Defendants understandably urge that Talamo presents no competent summary judgment evidence to raise a genuine issue of fact that her employer actually violated *state* law. In similar circumstances, other courts have concluded that summary judgment was appropriate. *See, e.g., Williams v. Hosp. Serv. Dist.*, 250 F. Supp. 3d 90, 69-97 (M.D. La. 2017) (granting summary judgment to employer where plaintiff did not present proof of employer's actual violation of state law).

schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-aged children." *Burlington*, 548 U.S. at 69 (citing *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  Here, Talamo presents evidence that Corporate Defendants assigned her to work on the West Bank despite knowing that Talamo sought employment on the East Bank to be near her minor children.  The Corporate Defendants' decision to change Talamo's location following her reports to Fresenius and the state agencies, coupled with her allegations of abusive meetings and payment delays, arguably satisfy Talamo's initial burden of demonstrating a genuine dispute for the trier of fact as to whether a reasonable person would consider Corporate Defendants' conduct to have "dissuaded a reasonable worker" from refusing to participate in or reporting a violation of state law.  *Id.* at 68 (quoting *Washington*, 420 F.3d at 662) (citation omitted).  However, Corporate Defendants rebut Talamo's *prima facie* case with summary judgment evidence that Talamo, a dialysis nurse untrained in hemodialysis, was required to receive such training and that the available location for such training happened to be on the West Bank.  Corporate Defendants further show that Talamo was trained at that time, apart from other employees, because she was the first nurse to be hired.  As to Talamo's charge that she was shorted by $500 on a referral bonus, receiving the $1,500 rate for such bonuses in place at the time it was processed rather than the $2,000 rate in place at the time she made the referral, Corporate Defendants demonstrate that she was paid the bonus according to company policy.  And while Talamo argues she is owed interest on travel reimbursements, which, while made to her, were allegedly delayed, she points to no company policy or practice supporting her claim for interest.  Talamo insists that the close proximity in time between her reassignment and reporting, all amidst a series of abusive meetings and the pay issues, could cause a reasonable employee to refrain from reporting a violation.  The Court disagrees,

given the Corporate Defendants' explanations and evidence for their actions. Cases relevant to the Whistleblower Statute are replete with caution that criticisms and meetings, while sometimes difficult, are part of the job. Talamo has not shown that either the number of meetings or the level of criticism was out of the ordinary. Nor has she demonstrated that Fresenius' explanations for her temporary reassignment for hemodialysis training and for the relatively insignificant, *de minimus* pay issues are not reasonable, much less at odds with company policy. Talamo has not pointed to substantial evidence showing that retaliation was a "but for" cause of the actions she contends constitute adverse employment decisions – an essential element of her claim under the Louisiana Whistleblower Statute. Consequently, Talamo has not shown that a genuine dispute exists on the issue of reprisal, and summary judgment denying Talamo's whistleblower claim is appropriate.

### 2. Intentional Infliction of Emotional Distress (Count VI)

To prove intentional infliction of emotional distress in Louisiana, a plaintiff must show: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991). Extreme and outrageous conduct is that which exceeds "all possible bounds of decency" and is "regarded as atrocious and utterly intolerable in a civilized community." *Id.* "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* In the workplace setting, a claim for intentional infliction of emotional distress has been "limited … to cases which involve a pattern of deliberate, repeated harassment over a period of time." *Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1026 (La. 2000) (citing *White*, 585 So. 2d at 1205; *Maggio*

*v. St. Francis Med. Ctr., Inc.*, 391 So. 2d 948 (La. App. 1980)). "The distress suffered by the employee must be more than a reasonable person could be expected to endure." *Id.* at 1027; *see also Goldberg v. Moses*, 811 So. 2d 1165, 1167 (La. App. 2002). The distress must be extreme; a "lesser degree of fright, humiliation, embarrassment or worry" is insufficient. *Nicholas*, 765 So. 2d at 1027 (citing *White*, 585 So. 2d at 1210); *see also Smith v. Amedisys, Inc.*, 298 F.3d 434, 450 (5th Cir. 2002) (observing that Louisiana jurisprudence sets a high threshold for the severity prong).

The evidence presented by Talamo fails to raise a genuine dispute about the extremity of Defendants' conduct and the severity of her distress. Neither the complaints to which Talamo was allegedly subjected, nor Clark's alleged instruction that a co-worker act in a verbally aggressive manner towards Talamo in a meeting, constitutes extreme and outrageous conduct sufficient to warrant recovery on a claim for intentional infliction of emotional distress. The former are the typical annoyances of the workplace, and the latter appears to be a one-time event. *Compare Nicholas*, 765 So. 2d at 1028-30 (year-long corrective review directed at plaintiff was not extreme, outrageous, or beyond the bounds of decency), *with Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1145-46 (5th Cir. 1991) (reasonable jury could find that employer's "assigning an executive with a college education and thirty years experience to janitorial duties," with intentional and systematic design to humiliate him into quitting, was extreme and outrageous). Even if "arbitrary and without compassion," *see Nicholas*, 765 So. 2d at 1028-30, the Defendants' issuance of corrective action forms (which do not themselves constitute discipline), and their rough treatment of Talamo in meetings, do not meet the high threshold of extreme and outrageous conduct in part because the record is devoid of any evidence to suggest that the corrective actions were unwarranted.

Furthermore, Talamo's intermittent episodes of insomnia requiring a "low dose" of sleep aid medication are insufficient to demonstrate severe emotional distress.[88]  *See Sabre Indus., Inc. v. Module X Sols., LLC*, 2017 WL 4183070, at *3-5 (M.D. La. Sept. 19, 2017) (plaintiff who took sleep medication for sleep apnea but had no medical records of psychological distress failed severity prong); *see also Smith*, 298 F.3d at 450 (plaintiff who sought treatment from family practitioner and neurologist for stress-related headaches caused by persistent verbal and physical harassment at place of employment did not meet severity prong).  As Talamo's treating physician acknowledged, "[i]nsomnia is … a common adult complaint,"[89] and Talamo's symptoms, unaccompanied by reports of anxiety or depression,[90] are also common in adults.  Even if Talamo's reported episodes of sleeplessness were caused by Defendants' conduct, her reaction was not sufficiently severe to recover for intentional infliction of emotional distress.  The evidence does not show that the distress Talamo alleges was "unendurable" in the sense established for actionable conduct under Louisiana law.  *See Smith*, 298 F.3d 450 (affirming summary judgment on severity prong in light of high threshold set by Louisiana law); *Nicholas*, 765 So. 2d 1017, 1030 ("although [plaintiff] genuinely felt humiliated, anxious, confused, upset and worried because of the corrective review process, we cannot say that [plaintiff's] emotional distress was more than a reasonable employee might be expected to endure in the workplace").  Therefore, because Talamo cannot establish either of the first two elements of a claim for intentional infliction of emotional distress, her claim fails, and the Court need not reach the third element of intent.

---

[88] R. Doc. 93-10 at 4, 9.
[89] *Id.* at 7.
[90] *Id.* at 36, 233.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendants' motion for summary judgment (R. Doc. 84) is GRANTED, and all of Talamo's claims are hereby DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 3rd day of July, 2019.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE